UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GLENN AARONSON, MQ DISTRIBUTION LLC,
MR. SNACK HAT LLC, DAVID DECILLA, LD
COOKIE CORP., RICARDO RAMSOOMAIR,
HSIU FANG LAU, JOHN CASTLES, JOSEPH
MCSWEENEY, and TJF SNACKS, LLC,

        Plaintiffs,

   v.

KELLOGG COMPANY,

        Defendant.
------------------------------------------------------------------X

**FILED**
**CLERK**

5/14/2020 4:01 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM & ORDER**
18-CV-5616 (SJF) (AKT)

FEUERSTEIN, District Judge:

   Plaintiffs Glenn Aaronson ("Aaronson"), MQ Distribution LLC ("MQ Distribution"), Mr.

Snack Hat LLC ("Mr. Snack Hat"), David DeCilla ("DeCilla"), LD Cookie Corp. ("LD

Cookie"), Ricardo Ramsoomair ("Ramsoomair"), Hsiu Fang Lau ("Lau"), John Castles

("Castles"), Joseph McSweeney ("McSweeney"), and TJF Snacks, LLC ("TJF Snacks")

(collectively "Plaintiffs") commenced this diversity action against Defendant Kellogg Company

("Kellogg" or "Defendant") alleging various state law causes of action.  Currently before the

Court is Defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  *See* Motion, Docket Entry ("DE") [20].  For the reasons set forth below, the motion

is granted.

## I.  BACKGROUND

### A. Factual Background

   The following facts are taken from the First Amended Complaint ("FAC"), DE [10], and

are assumed to be true for purposes of this motion.

1.  <u>The Snack Distribution System</u>

Defendant Kellogg is a Delaware corporation with its principal place of business located in Michigan.  In October 2000, Kellogg acquired Keebler Foods Company ("Keebler").  At all relevant times, Kellogg manufactured, marketed, and distributed snack foods including, *inter alia,* Keebler cookies and crackers. As part of the acquisition, Kellogg procured Keebler's Direct Store Door ("DSD") delivery system. FAC ¶32.  DSD is a method of delivering product from a supplier/distributor directly to a retail store and bypassing the retailer's distribution center.

The DSD model relied on "third-party, independent contractor subdistributors, such as Plaintiffs, who worked in tandem with certain independent third-party master distributors" for the delivery and distribution of Kellogg's snack products.  FAC ¶3.  Both the subdistributors and master distributors are collectively referred to as Direct Store Delivery Distributors ("DSDD").  Relevant to Plaintiffs' allegations are two master distributors, Two Locks, Inc. d/b/a Premier Snack Distributors ("Premier") and W.M. Brown Group, Inc. ("W.M. Brown"), who are not named as parties.  W.M. Brown provided Kellogg with warehouse space in Nassau County, New York.  A third master distributor, Condal Distributors, Inc. ("Condal"), also worked in the New York metropolitan area.

Plaintiffs were all subdistributors of snack products manufactured by Kellogg and acquired their first routes at different times between 2000 and 2016.  They acquired their respective routes for valuable consideration and added stores to their routes in exchange for monetary consideration as late as 2016.[1]  In exchange, Plaintiffs received "the right as

---

[1] The complaint contains numerous specific allegations regarding each plaintiff's acquisition of distribution routes, geographic areas covered by the routes, amounts paid, and weekly revenues.  *See* AC ¶¶46-86.  As these details are not germane to the issues presented by the instant motion, they are not repeated here.

independent DSDD subdistributors to deliver Defendant's product on a certain distribution route, to various stores including larger grocery chains, as well as smaller convenience stores and bodegas." FAC ¶34.  All the routes were acquired under Kellogg's DSD model, and as subdistributors, Plaintiffs worked with master distributors including Premier and W.M. Brown.

The relationship between Kellogg and the master distributors was set forth in a series of contractual agreements. One such agreement, the "DSDD Distributor Agreement" was entered into on or about February 24, 2009 between Kellogg and Premier.  Pursuant to that agreement, Kellogg authorized Premier to purchase snack products from Kellogg and to then resell those products in a defined geographic territory.  Premier then entered into various contracts with third-party independent subdistributors including plaintiffs Aaronson, DeCilla, and TJF Snacks. Plaintiffs allege that "at the relevant times, Kellogg and its employees and agents were aware of and approved Premier's practice of assigning the rights to various distribution routes to DSDD subdistributors including plaintiffs Aaronson, DeCilla, and TJF Snacks." FAC ¶90.

In 2008, Kellogg's CEO announced that, as a result of various business difficulties experienced by the company,  it would undertake an aggressive three-year cost-cutting initiative called "K-Lean" FAC ¶39.  K Lean "proved a disaster," leading to factory worker layoffs, product shortages, and product recalls. *Id.* ¶40.  In 2011, Kellogg replaced its CEO. Despite other actions, Kellogg remained dependent upon its cereal business, which was suffering from declining sales.

In November 2013, Kellogg launched its "Project K" program, which promised corporate cost-cutting and efficiency initiatives aimed at substantial savings. By mid-2015, Wall Street analysts had commented positively on Project K's impact on Kellogg's earnings.

3

2.  <u>Kellogg's Relationship with Master Distributor Premier</u>

By letter dated June 30, 2014, Kellogg notified Premier that, pursuant to the terms of the

parties agreement, it intended to terminate Premier as a master distributor effective within 90

days. Premier's CEO and counsel took steps to preserve the company's longstanding relationship

with Kellogg, engaging in correspondence during August and September 2014. This

correspondence "demonstrates that Kellogg was pushing Premier to phase out warehouse

locations and subdistributors in order to consolidate Kellogg's distribution footprint." FAC ¶93.

Kellogg sought a consolidation plan involving a maximum of three (3) warehouses. Premier

indicated that it needed to retain "flexibility with respect to the third-party subdistributors it

retains." *Id.* ¶95. Kellogg responded that it required "the flexibility to adapt to changing market

conditions" and refused to agree to the continued use of any subdistributors absent additional

clarity regarding the role of the subdistributors. *Id.*¶96.

In October 2014, Premier filed an action in this District against Kellogg alleging various

causes of action related to Kellogg's attempt to terminate its DSDD Agreement with Premier.

*See Two Locks, Inc. v. Kellogg Sales Co*, No. 14-CV-5917 (ADS) (ARL). Premier's motion for a

preliminary injunction was denied in December 2014, Premier voluntarily dismissed the action

with prejudice in February 2015 pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil

Procedure, and Premier continued operating as a master distributor, "suggesting that the parties

reached a resolution to the litigation of that involved a resumed distribution relationship between

Kellogg and Premier." FAC ¶99.

In early 2015, Kellogg made staffing changes in the region including the appointment of

James Yany ("Yany") to oversee its snack division in the New York metropolitan area. Yany

reported directly to Ted Engle ("Engle"), a regional sales director in charge of managing various

product, including the snack product distributor by plaintiffs. During 2015, Aaronson and nonparty Mastrosimone, acting on behalf of DeCilla and LD Cookie, began having "more frequent direct contact" with Engle and Yany. FAC ¶102.  Aaronson routinely dealt directly with Yany and Engle, speaking with them by phone to order Kellogg product, discuss his distribution route, and express his "displeasure" with Premier and its CEO, Marc Ceruto. FAC ¶103.

In or around November 2015, Kellogg conducted a meeting at Premier's Brooklyn warehouse which was attended by Kellogg employees, Ceruto and other Premier employees, and various DSDD distributors including Aaronson.  One speaker at the meeting was David Biller, a former Premier executive who had gone to work at Kellogg two years earlier. The meeting focused on "subdistributors' problems with Premier and ways in which distribution could be improved going forward." FAC ¶104.  Although Biller described Project K as a company-wide, cost-cutting initiative, no Kellogg employee made any mention of the project's impact on the DSDD model in the New York area.

In November and December 2015, Mastrosimone was in regular direct communication with Yany and Engle regarding potential opportunities to expand LD Cookie's distributorship by adding stores regardless of questions about Premier's status as a master distributor. Mastrosimone offered LD Cookie as a "better alternative to Premier snacks." FAC ¶106.  In response, Engle acknowledged Mastrosimone's desire and stated that "if in the future we have the need for a new distributor in the NY metro market we will be in touch to discuss in more detail  *Id.* ¶107.

On or about January 7, 2016, Yany held a breakfast meeting at Premier's Brooklyn warehouse which was attended by Yany, Engle, some Premier staff, and about twenty-five snack route distributors including Aaronson. At that meeting, Yany and Engle "spoke about the 'future

of Kellogg's business' and addressed concerns from some of the distributors, including complaints about purported price-undercutting by certain distributors." FAC ¶108.

At some unspecified time in early 2016, Yany told Aaronson that Kellogg intended to terminate its master distributor relationship with Premier.  Aaronson also began having discussions, "primarily with Mr. Yany, about growing his distribution route in New Jersey, with an eye on consolidating his route and, eventually, becoming a master-distributor like Premier." FAC ¶109.  In response, Yany reportedly "made repeated reassurances" to Aaronson, telling him not to worry, that "we are cutting the cord with Mark [Ceruto, Premier's CEO]" and "sit tight – just keep doing what you're doing." *Id*.  During the course of these discussions, Yany did not mention Kellogg's plan to abandon the DSD distribution model, including the DSDD model used in the New York metropolitan area.

On or about January 20, 2016, Kellogg terminated Premier as a master distributor, ceasing all business with Premier and Ceruto. Another master distributor, Condal, was also terminated in early 2016.

3.  Kellogg's Continued Relationship with Master Distributor W.M. Brown

After Premier's termination, Kellogg informed certain subdistributors, including Aaronson and LD Cookie, that in order to continue working their distribution routes, they needed to enter into an affiliation with the remaining master distributor, W. M. Brown. "Put simply, Kellogg needed to keep subdistributors in place on all of the existing routes to continue delivering product until it sprung the trap on its final termination of its DSD distributors throughout the New York Metropolitan market. Consistent with this purpose, Kellogg, per David Biller, actively supervised W. M. Brown's entering into contracts with subdistributors to ensure that the entire geographic footprint was covered." FAC ¶130

Aaronson and LD Cookie were hesitant to work with W. M. Brown, and upon information and belief, certain unnamed subdistributors "begrudgingly acquiesced to Kellogg's demand in the weeks following Premier's termination, as these DSDDs could not afford to engage in protracted negotiations while Kellogg refused to arrange for access to their product." FAC ¶121.  In early 2016, a meeting was arranged by Kellogg and W.M. Brown and held at W. M. Brown's warehouse in Bethpage, Long Island, so that DSDD subdistributors, including Aaronson and nonparty Matthew Bruno, could air their concerns regarding the transition to working with W. M. Brown. In addition to Aaronson and Bruno, the meeting was attended by W. M. Brown owner Warren Brown, its manager Mike Ambrosio, and Kellogg employees Yany and Engle.  Yany and Engle questioned the subdistributors about whether they could be trusted or would instead remain loyal to Premier. They further questioned the subdistributors regarding their routes and the amount of money each had paid to acquire each route. Aaronson expressed concern about the reduced commission he would receive working with W. M. Brown, 13-14% as compared to the 17% commission he had earned working with Premier. Yany and Engle promised Aaronson that additional stores were becoming available and that "they would see to it that these stores were assigned to Mr. Aaronson." *Id.*  ¶125.

DeCilla and LD Cookie were reluctant to become affiliated with W. M. Brown, despite having received reassurances from Yany that "we put in a good word for you." FAC ¶126. Mastrosimone emailed Kellogg on February 29, 2016 expressing concern about Premier's termination. In response he received a phone call from Engle's supervisor, James Holton, who directed Mastrosimone to address his concerns with Yany, Engle, and Mike Ambrosio. Engle phoned Mastrosimone and advised him that W. M. Brown would be the sole master distributor in the New York Metropolitan market. Engle asked Mastrosimone what he and DeCilla wanted,

and Mastrosimone stated he wanted a larger number of stores for LD Cookie and an assurance that its interests would be protected going forward. Engle reassured Mastrosimone repeatedly telling him "you'll get what you want." FAC ¶128.

4. Plaintiffs' Contacts with Kellogg in 2016[2]

In 2016, Plaintiffs continued to work their distribution routes.  At no time during 2016 were plaintiffs informed of Kellogg's plan to abandon the DSD distribution model. FAC ¶136.

a. *Aaronson's contacts with Kellogg*

After terminating Premier, Kellogg came to rely heavily on Aaronson, requesting that Kellogg be allowed to deliver and store product directly with Aaronson at his New Jersey warehouse in order to accommodate other, smaller distributors who required a centrally located warehouse from which to pick up product.  By the time Premier was terminated in January 2016, Aaronson and his former partner were delivering about 75% of Kellogg's snack product in New Jersey as DSDD distributors through direct shipments from Kellogg to the warehouse facility rented by Aaronson. Aaronson was spending approximately $3000 monthly to rent the warehouse, but allowed Kellogg to use his warehouse space "for no monetary consideration." FAC ¶114.

Around this time, Aaronson informed Yany that he wanted an exclusive New Jersey distributorship, and Yany reassured Aaronson that "it will happen – sit tight." FAC ¶112.   Yany and Engle "repeatedly made assurances to Mr. Aaronson, telling him that he was 'winning a lot of points with Kellogg' and making similar statements suggesting that Mr. Aaronson was

---

[2]With the exception of Aaronson and LD Cookie, as set forth *infra,* there are no allegations of any direct contact between the Plaintiffs and Kellogg.  Plaintiff Lau acquired her route in April 2016, and McSweeney invested an additional $20,000, "for the purpose of purportedly protecting his exclusive right to distribute call Kellogg snack products to certain specific locations." FAC ¶136.  There is no allegation suggesting that either took any action as a result of any contact with Kellogg.

positioning himself favorably with Defendant to gain more business." *Id.* ¶115. In an email

dated February 26, 2016, Yany, addressing Aaronson's request for an expanded distribution role,

wrote "all the work you're doing will not go unnoticed and you have my word that your [sic] will

be protected going forward." *Id.* ¶116 (alteration in original).

In August 2016, Aaronson consulted with Yany about acquiring additional stores for his

route for cash consideration. Yany advised Aaronson to proceed with the transaction, which

Aaronson did "in express reliance on Yany's advice and assurances." FAC ¶117.  Aaronson

continue to consolidate his route by adding additional stores and expending funds to do so

"including an acquisition of additional stores for cash consideration in or about August 2016

based on James Yany's advice and assurances." *Id.* ¶136.

> b.  *LD Cookie's contacts with Kellogg*

 In or around March 2016, Mastrosimone met with Ambrosio and Engle at W. M.

Brown's warehouse to discuss LD Cookie's distribution route and to negotiate for a larger

distributorship.  Ambrosio had concerns about assigning an additional 144 stores to LD Cookie,

to which Engle stated "give him what he wants. Just give him what he wants." FAC ¶133.  Engle

did not mention Kellogg's intent to discontinue the DSD distribution model. Shortly after the

meeting, DeCilla elected to proceed with the increased route, and by mid-2016, Mastrosimone

had hired two (2) additional employees to assist him in managing the distribution route.

> 5.  <u>Changes to the Distribution Model</u>

In early February 2017, McSweeney heard other distributors at the W.M. Brown

warehouse discussing that Kellogg was possibly discontinuing its relationship with W. M.

Brown. Plaintiffs were not advised of Kellogg's discontinuation plan. On information and belief,

"many DSD D subdistributors were misinformed by Kellogg agents that the DSDD model

utilized in the New York Metropolitan market would be insulated from any cuts undertaken by defendant, and in fact, would remain viable." FAC ¶140.

On February 8, 2017, Kellogg formally announced its plan to switch delivery methods, discontinuing DSD in favor of a centralized warehouse model. This decision was reportedly part of the Project K program.  Following the announcement, Plaintiffs continued to diligently work their routes as Kellogg had not informed them or other subdistributors that their distribution rights were being eliminated. In some instances, unspecified Plaintiffs were informed by W. M. Brown employees, including Ambrosio, that the cuts would not affect the New York market and their distribution rights would remain safe.

On February 28, 2017 Yany emailed the New York area DSDDs, including Aaronson, regarding Kellogg's decision "to close all (39) Kellogg's dc locations and begin distributing Kellogg's Snacks to each of you through the (7) KDC locations throughout the country."   FAC ¶143.  The email included an attachment providing procedures for placing orders with Kellogg and to receive shipments "from so-called 'NSD'warehouses." *Id.*  ¶143.  Engle assured Mastrosimone that LD Cookie's business was not affected, distinguishing DSD from DSDD distribution and assuring him that he had "nothing to worry about" and that "if anything [he] might get more business because of the change." *Id.*  ¶144.

On May 11, 2017, Plaintiffs were notified by W. M. Brown of Kellogg's intention to abandon its DSD model, including the DSDD model utilized in certain markets including New York. Plaintiffs received a copy of a letter dated May 5, 2017 from Kellogg to W. M. Brown terminating Kellogg's distribution agreement with W.M. Brown effective August 4, 2017. FAC ¶145; Exhibit 2.  Kellogg indicated that it intended to terminate the relationship in furtherance of

Kellogg's plan to revert to "return to a centralized warehouse distribution model by the 4th

quarter of 2017." FAC ¶22.

     6.  <u>Kellogg's Secret Plan</u>

     Plaintiffs allege, on information and belief, that Kellogg had decided by at the latest June

2014 to discontinue the DSD distribution model and revert to a centralized warehouse system,

The amended complaint refers to this alleged decision and acts taken subsequently as Kellogg's

"secret plan." *See, e.g.,* FAC ¶¶ 39, 45.  On information and belief, Kellogg "made no public

statement concerning its intention to eventually discontinue the DSD model" from 2013 until

2017.  *Id.*  ¶44.

     Kellogg's decision to end its relationship with Premier was "a necessary initial step in

[Kellogg's] plan to do away with its then-existing distribution model, in favor of returning to a

traditional centralized warehouse distribution model." FAC ¶¶21.  Kellogg's termination of its

agreement with W.M. Brown also furthered the plan.  It needed to keep the distributors working

as long as possible "until a replacement delivery and distribution network could be established

and was ready to commence operations." *Id.* ¶6.  To that end, Kellogg and its employees or

agents sought to ensure Plaintiffs' continued performance as distributors by making "repeated

misrepresentations to Plaintiffs" that inured to Kellogg's benefit and Plaintiffs' detriment.  *Id.*

¶7.  "As a result of Kellogg's secret plan to entirely discontinue its DSD model, as carried out

under its Project K initiative, Plaintiffs have lost their businesses and likelihoods and been

severely damaged." *Id.* ¶146.

**B.  Procedural History**

     Plaintiffs commenced this action on October 9, 2018, and filed their First Amended

Complaint on December 17, 2018.   They state five (5) causes of action for (1) breach of

fiduciary duty; (2) constructive fraud; (3) negligent misrepresentation; (4) quantum meruit; and (5) unjust enrichment.  Plaintiffs claim in their "Preliminary Statement" that they are bringing the case "on behalf of similarly situated Plaintiffs who have been gravely damaged by defendant [Kellogg's] pattern of misrepresentations and failure to honor its business commitments," but have not asserted a class claim.  Defendant has moved for dismissal of the amended complaint in its entirety for failure to state a claim for relief.

## II.  LEGAL STANDARDS

Defendant seeks dismissal of the action pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The standards for analyzing a motion to dismiss are well-established.  The court must accept the factual allegations in the complaints as true and draw all reasonable inferences in favor of the plaintiff.  *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (citations omitted).  The court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'"  *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal,* 556 U.S at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

The determination of "whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal,* 556 U.S at 679.   A pleading that does nothing more than recite bare legal conclusions, however, is insufficient to "unlock the doors of discovery."  *Iqbal*, 556 U.S. at

678-679; *see also Twombly,* 550 U.S. at 555 (holding that a "formulaic recitation "formulaic recitation of cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level."). While Rule 8 does not require "detailed factual allegations," it does require more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555).

Rule 9 (b) further requires that claims of fraud be pled with particularity, FED. R. CIV. P. 9(b), requiring a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata v. New York-Presbyterian Healthcare Sys.,* 723 F.3d 192, 197 (2d Cir. 2013) (internal quotation marks and citations omitted). In other words, a plaintiff alleging fraud "must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." *Bruno v. Zimmer, Inc.,* No. CV 15-6129, 2016 WL 4507004, at *3 (E. D. N. Y. Aug. 26, 2016) (internal quotation marks and citations omitted). "Conclusory statements and allegations are not enough to meet the Rule 9(b) pleading requirements." *Musalli Factory for Gold & Jewelry Co. v. JP Morgan Chase Bank, N.A.,* 382 F. App'x 107, 108 (2d Cir. 2010) (summary order).

Rule 9(b) applies to constructive fraud "as it closely resembles the legal elements of a fraud claim." *Spinnato v. Unity of Omaha Life Ins. Co.,* 322 F. Supp. 3d 377, 404 (E.D.N.Y. 2018); *see also Senior Health Ins. Co. of PA v. Beechwood Re Ltd.,* 345 F. Supp. 3d 515, 529-30 (S.D.N.Y. 2018) (noting the division in the Second Circuit over whether Rule 9(b) applies to all constructive fraud claims, but finding that "at a minimum, misstatements and omissions in a constructive fraud claim must be pled with the same specificity as those in an actual fraud claim"). A negligent misrepresentation claim also "must be pled in accordance with the specificity criteria of Rule 9(b)." *Aetna Cas. & Sur. Co. v. Aniero Concrete, Co.,* 404 F.3d 566,

583 (2d Cir. 2005); *see also Oden v. Boston Scientific Corp.,* 330 F. Supp. 3d 877, 900-01

(E.D.N.Y. 2018).

## III.  DISCUSSION[3]

### A.  Claims for Breach of Fiduciary Duty, Constructive Fraud, and Negligent Misrepresentation

1.  Kellogg's Secret Plan

Plaintiffs' claims for breach of fiduciary duty, constructive fraud, and negligent

misrepresentation hinge, in whole or in part, upon their contention that Kellogg had, since 2014,

a secret plan to change its business model and eliminate the DSD distribution system.  Plaintiffs

claim that Kellogg had an obligation to disclose the existence of this plan to them, and its failure

to do so is actionable.  The existence of a secret plan is not supported by plausible,

nonspeculative allegations.

Plaintiffs allege, on information and belief, that Kellogg had decided as early as June

2014 to discontinue the DSD distribution system.  Relying upon documents from the Premier-

Kellogg litigation[4] in 2014, Plaintiffs "conclude" that the decision was made in 2014 "although

the process of transition would not be finalized until three years later in mid-2017."  FAC ¶4.

They have alleged that (1) Kellogg was experiencing some financial difficulties which led to its

implementation of Project K in 2013, and that (2) Kellogg changed its distribution model as a

cost-savings measure in 2017.  These two facts alone do not state a claim.  Instead of providing

---

[3] As the parties apparently agree that New York law controls, the court will apply it. *See, e.g., Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.").

[4] The documents referenced by Plaintiffs are part of the public record of filings made in 2014 in the *Two Locks v. Kellogg* case.   Regardless of whether Plaintiffs were aware of those filings, the mere fact that they were filed publicly with no attempt to maintain their confidentiality is at odds with the existence of a "secret plan"  requiring years to implement.

any fact-based allegations for the intervening time period, the amended complaint uses vague, unsupported allegations, largely made upon information and belief, to create a self-serving narrative that imposes liability on Kellogg for Plaintiffs' loss of their distribution routes with W.M. Brown.

In contrast to the lack of factual support for the secret plan theory, the amended complaint offers factual allegations consistent with other, more plausible rationales for Kellogg's actions. For example, Plaintiffs summarily allege that Kellogg's termination of its agreement with Premier was "a necessary initial step" in its plan to discontinue the DSDD model with no factual support; in contrast, Plaintiffs allege that they were aware of "Kellogg's general displeasure with Premier," FAC ¶105, and that they too were dissatisfied with Premier's performance and desired a change. *See, e.g., id.* ¶103 (Aaronson "frequently expressed displeasure with Premier" and its CEO during conversations with Yany and Engle in early-mid 2015); *id.* ¶104 (the meeting at Premier in November 2015 "focused on subdistributors' problems with Premier and ways in which distribution could be improved"). The facts as alleged more plausibly suggest that Kellogg terminated its agreement with Premier in light the latter's purported inadequacies rather than the first necessary step in a secret plan.

The amended complaint fails to plausibly allege facts supporting Plaintiffs' theory that Kellogg had a secret plan. Even were the Court to determine that these sparse allegations satisfied Plaintiffs' pleading burden, their claims fail for additional reasons as set forth below.

2.   Lack of Relevant Factual Allegations Pertaining to Certain Plaintiffs

The lack of any relevant factual allegations is fatal to the claims of Plaintiffs Ramsoomair, Lau, Castles, McSweeney, and TJF Snacks. The allegations concerning these Plaintiffs are limited to information such as when each obtained a distribution route or routes,

amounts paid for the acquisitions, the geographic locations of the routes, and the profits generated. *See, e.g.,* FAC ¶¶46-86. While there are a few allegations regarding communications between W.M. Brown and these Plaintiffs, there are no allegations whatsoever regarding any direct contact between them and Kellogg, or of any representations made by Kellogg to them. In addition, these Plaintiffs do not claim to have attended any of the meetings with Kellogg and Premier or W.B. Brown at which Kellogg allegedly failed to make specific disclosures. Accordingly, the following discussion addresses only the claims of Aaronson and his corporations, MQ Distribution and Mr. Snack Hat, and DeCilla and his corporation, LD Cookie.

3.   Lack of a Fiduciary Relationship

Plaintiffs' causes of action for breach of fiduciary duty and constructive fraud require the existence of a fiduciary or confidential relationship with Kellogg. The elements of a claim for breach of fiduciary obligation are: "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018). Absent adequate allegations of a fiduciary relationship between Plaintiffs and Kellogg, this claim fails. *See, e.g., Faktor v. Yahoo! Inc.,* No. 12 Civ. 5220, 2013 WL 1641180, at *2 (S.D.N.Y. Apr. 16, 2013). Constructive fraud requires proof that "(1) a representation was made; (2) the representation dealt with a material fact; (3) the representation was false; (4) the representation was made with the intent to make the other party rely upon it; (5) the plaintiff relied upon the representation; (6) the plaintiff was damaged; and (7) the parties were in a fiduciary or confidential relationship." *Cornelia Fifth Ave., LLC v. Canizales,* No. 12-cv-7660, 2016 WL 5390894, at *8 (S.D.N.Y. Sept. 26, 2016); *see also DelVecchio v. Nassau Cnty.,* 118 A.D.2d 615, 617-18, 499 N.Y.S.2d 765 (2d Dep't 1986). A constructive fraud differs from an actual fraud claim "by replacing the scienter requirement with the requirement that

Defendants maintained either a fiduciary or confidential relationship with Plaintiff." *LBBW Luxemburg S.A. v. Wells Fargo Secs. LLC,* 10 F. Supp 3d 504, 524 (S.D.N.Y 2014); *see also Brown v. Lockwood,* 76 A.D.2d 721,730, 432 N.Y.S.2d 186 (2d Dep't 1980) (the knowledge element "is replaced by a requirement that the plaintiff prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his confidence in the defendant and therefore to relax the care and vigilance he would ordinarily exercise in the circumstances").

It is undisputed that there was no direct contractual relationship between any Plaintiff and Kellogg,[5] nor does the amended complaint allege that these parties enjoy a relationship that, by its nature, imposes fiduciary responsibilities. *See, e.g., In re Heller,* 6 N.Y.3d 649, 655, 849 N.E.2d 262, 816 N.Y.S.2d 403 (2006) (trustee-beneficiary relationship); *Gottsch v. Eaton & Van Winkle LLP,* 343 F. Supp. 3d 372, 376 (S.D.N.Y. 2018) (attorney-client relationship); *Soley v. Wasserman,* 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011) (financial advisor-client, if the advisor has "discretionary authority to manage the client's accounts" (internal quotation marks and citation omitted)); *see also LBBW Luxemburg,* 10 F. Supp. 3d at 524 (a confidential relationship is found where there is "justifiable trust" and usually "involves a involves a relationship of trust such as parent and child, husband and wife, guardian and ward, trustee and cestui que trust, principal and agent, or attorney and client" (internal quotation marks and citation omitted)). Plaintiffs argue that Kellogg acted as its fiduciary "by virtue of the confidential working relationship between the parties," that the relationship gave rise to obligations including "duties of care, candor, loyalty, good faith and fair dealing, under the common law," and that Defendant breached those duties. FAC ¶¶148.-149.

---

[5] "While a contractual relationship is not required for a fiduciary relationship, if [the parties] do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *Oddo Asst Mgmt. v. Barclays Bank PLC,* 19 N.Y.3d 584, 593, 973 N.E.2d 735, 950 N.Y.S.2d 325 (2012).

A fiduciary relationship exists when one person is "under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman, Sachs & Co.,* 5 N.Y.3d 11, 19, 832 N.E.2d 26, 799 N.Y.S.2d 170 (2005) (citing RESTATEMENT SECOND OF TORTS §874, Comment a).  It is marked by "two essential elements . . . de facto control and dominance." *Marmelstein v. Kehillat New Hempstead,* 11 N.Y.3d 15, 21, 892 N.E.2d 357, 862 N.Y.S.2d 311 (2008) (internal quotation marks and citation omitted)); *see also People ex rel. Cuomo v. Coventry First LLC,* 13 N.Y.3d 108, 115, 915 N.E.2d 616, 886 N.Y.S.2d 671 (2009) (a fiduciary relationship "exists only when a person reposes a high level of confidence and reliance in another, who thereby exercises control and dominance over him").

In a commercial context, the fiduciary relationship "is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions." *EBC I, Inc.,* 5 N.Y.3d at 19.  "A conventional business relationship, without more, is insufficient to create a fiduciary relationship" instead, a plaintiff "must make a showing of special circumstances that could have transformed the parties' business relationship to a fiduciary one, such as control by one party of the other for the good of the other." *DiTolla v. Doral Dental IPA of New York, LLC,* 100 A.D.3d 586, 587, 953 N.Y.S.2d 155 (2d Dep't 2012) (internal quotation marks and citations omitted); *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F. Supp. 2d 385, 413-14 (S.D.N.Y. 2005) ("A fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity on another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another" (internal quotation marks and citation omitted)).

While the issue of whether a fiduciary relationship was established is fact-based, *see, e.g.,*

*Marmelstein,* 11 N.Y.3d at 21, the amended complaint fails to provide any allegations plausibly

suggesting that such a relationship existed between any Plaintiff and Kellogg.  Plaintiffs were

independent contractors who enjoyed, at most, a conventional business relationship with

Kellogg.  As subdistributors, Plaintiffs clearly could not deliver product that was not supplied to

them and thus they depended on Kellogg to maintain a relationship with the master distributors

and to supply products.  This dependence does not, by itself, transform the relationship between

Plaintiffs and Kellogg into a fiduciary one. The manufacturer-distributor relationship "creates a

confidential relationship, giving rise to fiduciary duties, only in rare circumstances," *United*

*Magazine Co. v. Murdoch Magazines Distrib., Inc.,* 146 F. Supp. 2d 385, 410 (S.D.N.Y. 2001),

and a distributor's dependence on a manufacturer to supply product is not, by itself, sufficient to

establish a confidential relationship.  *See, e.g., Rienzi & Sons, Inc. v. N. Puglisi & F Industria*

*Paste Alimentari S.p.A.,* 638 F. App'x 87, 91 (2d Cir. 2016) (summary order) ("the inherent

dominance stemming from a distributor's reliance on a manufacturer is not itself sufficient to

establish a confidential relationship"); *see also Legend Autorama, Ltd. v. Audi of Am, Inc.,* 100

A.D.3d 714, 717, 954 N.Y.S.2d 141 (2d Dep't 2012) (generally, "there is no fiduciary

relationship between a franchisee and a franchisor" and while an auto dealer is dependent upon

the auto manufacturer, "this dominance, taken alone, is insufficient to establish a confidential

relationship"). The relationship here is even more attenuated as Plaintiffs were merely

subdistributors.

There may be limited circumstances where a manufacturer-distributor relationship is

transformed into a fiduciary or confidential relationship.  For example, where a manufacturer

requires its distributor to share confidential, proprietary business information, the manufacturer

may acquire a duty not to use that information to the detriment of the distributor.  *See United Magazine,* 146 F. Supp. 2d at 410-11; *Abernathy-Thomas Eng'g Co. v. Pall Corp.,* 103 F. Supp. 2d 582, 601-603 (E.D.N.Y. 2000).  The amended complaint contains no allegations suggesting that Plaintiffs shared confidential business information with Kellogg with the result that the company enjoyed a superior, dominant position over Plaintiffs.   The only arguable allegation regarding the sharing of information arises out of the January 2016 meeting at W.M. Brown when Yany and Engle "specifically inquired about the subdistributors' respective routes, and the amount of money that each subdistributor had paid in order to acquire these routes."  FAC ¶124. There is no allegation that Plaintiffs were pressured to respond or, indeed, if they did provide the information.  "Plaintiffs' (apparently) voluntary sharing of information with the Distributors does not provide the rare circumstances giving rise to a fiduciary duty or other duty of confidence." *United Magazine,* 146 F. Supp. 2d at 411.  There is also no allegation that Kellogg acquired a position of dominance over Plaintiffs, or that it used any information it may have obtained to its advantage and Plaintiffs' detriment.

Since the amended complaint fails to plausibly allege the existence of a fiduciary or confidential relationship between Plaintiffs and Kellogg, the causes of action for breach of fiduciary duty and constructive fraud will not lie and are dismissed.

In their opposition papers, Plaintiffs argue that they enjoyed a "special relationship" with Kellogg that created a duty to disclose on Kellogg's part.  *See* Plaintiffs' Memorandum of Law in Opposition ("Pls' Opp.") at 7-8, DE [20-2].  The duty to disclose element is required in various causes of action including fraudulent concealment.  *See Ellington Credit Fund, Ltd. v. Select Portfolio Serv'g, Inc.* 837 F. Supp. 2d 162, 201 (S.D.N.Y. 2011).  Although it is not an enumerated cause of action in the amended complaint, Plaintiffs suggest that they have asserted a

fraudulent concealment claim.  *See* Pls' Opp. at 10.   A fraudulent concealment claim is a

similar, though different, cause of action than the constructive fraud claim set forth in the

amended complaint.  *See Zackiva Comm'cns Corp. v. Horowitz,* 826 F. Supp. 86, 89 (S.D.N.Y.

1993) (noting that "[t]he elements of a claim for fraudulent concealment under New York law

are extremely similar to the elements of a claim for constructive fraud); *Ajettix Inc. v. Raub,* 9

Misc.3d 908, 916, 804 N.Y.S.2d 580 (Sup. Ct. 2005) ("[c]onstructive fraud is similar to

fraudulent concealment except that the element of scienter need not be proven" for the former);

*see also Cornelia Fifth Ave.,* 2016 WL 5390894, at *8 (setting forth different elements for

constructive fraud and fraudulent concealment claims).

It is well settled that "Plaintiffs cannot amend their complaint by asserting new facts or

theories for the first time in opposition to Defendants' motion to dismiss."  *Hurley v. Town of

Southampton,* No. CV 17-5543, 2018 WL 3941944, at *18 (E.D.N.Y. Aug. 13, 2018) (internal

quotation marks and citation omitted).   The second cause of action, entitled "Constructive

Fraud," does not state a claim for fraudulent concealment, failing, *inter alia,* to even mention

"conceal," "concealment," or a duty to disclose.  However, even assuming the allegations of the

amended complaint could be read to assert a fraudulent concealment claim, it too fails.

One element of a claim for fraudulent concealment is the existence of "a relationship

between the parties creating a duty to disclose."  *Cornelia Fifth Ave.,* 2016 WL 5390894, at *8 .

In the context of discussions or negotiations concerning a business transaction, a duty to disclose

may arise in two situations: "where the parties enjoy a fiduciary relationship" or "where one

party possesses superior knowledge, not readily available to the other, and knows that the other

is acting on the basis of mistaken knowledge."  *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292

(2d Cir. 2006) (internal quotation marks and citation omitted).  "[A] duty to disclose due to one

party's superior knowledge. . .ordinarily arises only in the context of business negotiations where parties are entering a contract." *Harbinger Capital Partners LLC v. Deere & Co.,* 632 F. App'x 653, 657 (2d Cir. 2015) (summary order) (internal quotations marks and citation omitted; alteration in original).

The amended complaint fails to allege, with any specificity, a particular business transaction or context in which a duty to disclose may have arisen.  Plaintiffs' unilateral requests to become master distributors or its discussions regarding additional routes it could acquire from W.M. Brown are not "negotiations" that would trigger any duty to disclose by Kellogg.  *See Harbinger,* 632 F. App'x at 657 (superior knowledge doctrine does not apply as plaintiff "was not engaged in business negotiations with any of the defendants"); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,* No. , 1994 WL 88129, at *11 (S.D.N.Y. Mar. 15, 1994) ("Inferences and allusions to contracts and transactions establishing a relationship in which a general duty to disclose may arise do not withstand Rule 9(b) scrutiny").

4.  Lack of a Special Relationship

To  state a claim for negligent misrepresentation, a plaintiff must show: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & co.,* 690 F.3d 98, 114 (2d Cir. 2012) (internal quotation marks and citation omitted).  "[T]he standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous

than that of a fiduciary duty."  *Musalli Factory For Gold  & Jewellry v. JP Morgan Chase Bank, N.A.,* 261 F.R.D. 13, 28 (S.D.N.Y. 2009), *aff'd* 382 F. App'x 107 (2d Cir. 2010).

"Because 'casual statements and contacts' are prevalent in business, liability in the commercial context is 'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'"  *Eternity Global Master Fund Ltd v. Morgan Guar. Trust Co.,* 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Kimmell v. Schaefer,* 89 N.Y.2d 257, 263, 675 N.E.2d 450, 652 N.Y.S.2d 715 (1996)).  As discussed above, the amended complaint does not adequately allege facts that plausibly establish a fiduciary or confidential relationship between the parties.

The amended complaint alleges that Plaintiffs had relevant contacts with three Kellogg employees, Yany, Engle, and, in one instance, Biller, but does not allege that any one or more of these individuals occupied a special position of confidence vis-à-vis Plaintiffs, held a position at Kellogg that was high enough to lead Plaintiffs to rely on their authority by virtue of that position, or had specialized knowledge.  *Cf. Kimmell,* 89 N.Y.2d at 264 (defendant, the chief financial officer and chairman of the corporation, was "uniquely situated" such that the injured party justifiably relied upon his misrepresentations).  The secret plan was allegedly part of Project K, a well-known and advertised program.  A defendant's knowledge regarding the particulars of its own business is not "specialized knowledge."  *See generally MBIA Ins. Co. v. Residential Funding Co.,* 26 Misc.2d 1204(A), 2009 WL 5178337, at *5 (N.Y. Sup. Ct. Dec. 22, 2009) (noting that a company's "knowledge of the particulars of its own business is not the type of unique or specialized knowledge that the Court of Appeals was talking about in *Kimmell*").

23

5.   Additional Inadequacies in Constructive Fraud, Negligent Misrepresentation Claims

Plaintiffs' claims for constructive fraud and negligent misrepresentation fail for reasons beyond the failure to plead a special relationship imposing a duty upon Kellogg.  Both claims require plausible allegations that the statements were false and that Plaintiffs relied on them to their detriment.

The types of contacts between Kellogg and Plaintiffs fall into three broad categories:  (1) meetings between Kellogg, as well as either Premier or W.M. Brown, and subdistributors including some of the Plaintiffs; (2) exchanges of general information; and (3) specific representations made by Kellogg employees.  Beyond the alleged omissions of failing to apprise Plaintiffs of the secret plan, the meetings do not appear to be the source of any of the alleged misrepresentations.  The November 2015 meeting at Premier focused on the subdistributors' issues with Premier's performance, the January 2016 meeting at Premier addressed subdistributor concerns such as price-undercutting, and the January 2016 meeting at W.M. Brown concerned the transition of former Premier subdistributors to W.M. Brown.  Although the amended complaint alleges that Aaronson was promised the assignment of additional stores at the last meeting, *see* FAC ¶125, there is no allegation that this "promise" was not kept.  Similarly, the generalized communications are also not alleged to be misrepresentations.  For example, in early 2015, Aaronson "routinely" dealt directly with Yany and Engle by phone regarding his route and his displeasure with Premier. *Id.* ¶103.  In addition, Kellogg directly informed certain subdistributors, including Aaronson and LD Cookie, that in order to continue working their distribution routes, they needed to enter into an affiliation with master distributor W. M. Brown. *Id.* ¶120.

Turning to the statements alleged to be misrepresentations, the amended complaint generally references "repeated assurances" made by Kellogg, but contains only a handful of specific statements, all of which concern either Aaronson or LD Cookie.  The statements as to LD Cookie were: (1) a December 2015 email exchange where, in response to Mastrosimone's offer of LD Cookie's services as a master distributor, Engle stated that "if in the future we have the need for a new distributor in the NY metro market we will be in touch to discuss in more detail," FAC ¶107; (2) Engle's response in March 2016 to Mastrosimone's request for more stores for LD Cookie and an assurance that its interests would be protected going forward that "you'll get what you want," *id.*   ¶128; and (3) during a meeting in  March 2016 with W.M.Brown's Ambrosio and Engle, to negotiate a larger distributorship of 144 additional stores for LD Cookie, Engle said "give him what he wants. Just give him what he wants." *Id.*  ¶133. The specific statements concerning Aaronson[6] were as follows: (1) during discussions in early 2016 in which Aaronson sought to grow his route and eventually becoming a master distributor, Yany told him to "sit tight – just keep doing what you're doing." AC ¶109, "it will happen – sit tight," *id.*  ¶112, and told him he was "winning a lot of points with Kellogg," *id.*  ¶115; and (2) on February 26, 2016, Yany, addressing Aaronson's request for an expanded distribution role, wrote "all the work you're doing will not go unnoticed and you have my word that your [sic] will be protected going forward." *Id.*  ¶116 (alteration in original).

"Promises of future conduct are not actionable as negligent misrepresentations." *Murray v, Xerox Corp.,* 811 F.2d 118, 122 (2d Cir.1987). "[T]he alleged misrepresentation must be

---

[6] Aaronson also claims that in August of 2016, he consulted with Yany about acquiring additional stores for his route for cash consideration, that Yany advised Aaronson to proceed with the transaction, and that he acquired additional stores for cash consideration "in express reliance on Yany's advice and assurances." AC ¶117.  This allegation is insufficient to raise a claim  as it fails to identify any specifics, including any express statements made by Yany upon which Aaronson allegedly relied.

factual in nature and not promissory or relating to future events that might never come to fruition." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20-21 (2d Cir. 2000); *see also Eternity Global.,* 375 F.3d at 188 (affirming dismissal of negligent misrepresentation claim where defendant's representations regarding plaintiff's ability to take future action and defendant's ability to assist it in that action are "promissory representations about future events"). In addition, "statements of puffery, or those concerning future expectations, are insulated from liability." *Henneberry v. Sumitomo Corp. of Am.,* 415 F. Supp.2d 423, 452 (S.D.N.Y. 2006).

The bulk of the alleged misrepresentations are generalized, vague urgings or encouragements. In addition to being vague, they are at most, promises of future conduct, and not rooted in present fact. Both Mastrosimone's and Aaronson's attempts to be named master distributors were met with generalized promises of future action. *See* FAC ¶¶ 107, 109, 112. Some of the statements are not even *mis*statements as the "promises" came to pass. Both Mastrosimone and Aaronson were "promised" more stores, and both received additional stores. *Id.* ¶¶117, 128, 133. To the extent Plaintiffs allege that the local Kellogg employees made various misrepresentations in spring 2017 about the impact of Kellogg's decision to change its distribution system, they fail to allege any reliance or harm occasioned by these statements.

## B. Quasi-Contract Claims

Plaintiffs also assert claims for quantum meruit and unjust enrichment. Although Plaintiffs state them as two discrete claims, "[q]uantum meruit and unjust enrichment are not separate causes of action and are therefore analyzed under the same principles." *Associated Mtg. Bankers, Inc. v. Calcon Mut. Mtg. LLC,* 159 F. Supp. 3d 324, 337 (E.D.N.Y. 2016); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d

Cir. 2006) (the elements of an unjust enrichment claim in New York are " (1) that the defendant

benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require

restitution."); *Nasso v. Seagal*, 263 F. Supp. 2d 596, 616-17 (E.D.N.Y. 2003) ("In order to make

out a claim in quantum meruit, a claimant must establish (1) the performance of the services in

good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an

expectation of compensation therefor, and (4) the reasonable value of the services." (internal

quotation marks and citation omitted)).  As such, the court "may analyze quantum meruit and

unjust enrichment together as a single quasi contract claim." *Mid-Hudson Catskill Rural*

*Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 175 (2d Cir. 2005).

As with the first three claims, the amended complaint is devoid of any factual allegations

supporting a quasi-contract claim on behalf of Plaintiffs Ramsoomair, Lau, Castles, McSweeney,

and TJF Snacks, and accordingly, their claims are dismissed.  The claims of the remaining

Plaintiffs fare no better.

In their opposition, Plaintiffs claim that they "performed work and expended money in

reasonable reliance on a continued distribution relationship, to Kellogg's benefit, and equity and

good conscience demand a refund."  Pls. Opp. at 23-24.  Neither their papers nor the amended

complaint identifies either the work performed or the monies expended.

"A 'quasi contract' only applies in the absence of an express agreement, and is not really

a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust

enrichment." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 516 N.E.2d

190, 521 N.Y.S.2d 653 (1987).  The distribution work they performed through mid-2017 was

done pursuant to their contractual relationships with Premier and/or W.M. Brown.  They do not

claim that they were not compensated for the work performed.  Even if they had made such an

allegation, any claim for unjust enrichment against Kellogg is precluded by Plaintiffs'
agreements with the master distributors as "a claim for unjust enrichment, even against a third
party, cannot proceed when there is a valid, written agreement governing the subject matter of
the dispute." *Viable Mktg. Corp. v. Intermark Comm'cns, Inc.,* No. 09-cv-1500, 2011 WL
3841417, at *3 (E.D.N.Y. Aug. 26, 2011)

      The lone allegations falling outside the bounds of their contractual obligations with the
master distributors are Aaronson's claims regarding Kellogg's use of his warehouse "without
compensation."  The amended complaint fails to allege, however, that Aaronson had any
expectation of payment for that use.  "Courts applying New York law require a plaintiff to allege
some expectation of compensation that was denied in order to demonstrate that equity requires
restitution."  *Tasini v. AOL, Inc.,* 851 F. Supp. 2d 734, 740 (S.D.N.Y. 2012).

## C.  Leave to Amend

      Leave to amend a complaint "should be freely given when justice so requires," Fed. R.
Civ. P. 15(a)(2), but whether to grant or deny leave to amend lies in the sound discretion of the
court.  *See McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007).  Where a
plaintiff does not request leave to amend, the court may *sua sponte* decline to permit amendment.
*See Bright-Asante v. Wagner,* No. 15-CV-9110, 2017 WL 6948359, at *10 (S.D.N.Y. Dec. 1,
2017).  As the Second Circuit has held, "[w]hile leave to amend under the Federal Rules of Civil
Procedure is 'freely granted,' . . . no court can be said to have erred in failing to grant a request
that was not made.'"  *Cruz v. FXDirectDealer, LLC,* 720 F.3d 115, 126 (2d Cir. 2018) (internal
quotation marks and citation omitted); *see also Malgieri v. Ehrenberg,* No. 12-CV-2517, 2012
WL 6647515, at *9 (S.D.N.Y. Dec. 21, 2012) ("a district court has no obligation to grant leave to
amend *sua sponte*").

Plaintiffs, who are represented by counsel, have already amended their complaint once, and they have made no request, formal or informal, to further amend.  They did not cross-move to amend, nor have they provided a proposed second amended complaint or presented any factual enhancements.  As Plaintiffs have not requested leave to amend, much less provided any indication that repleading would cure the deficiencies discussed above, dismissal of the matter is with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss [20] is granted and the Clerk of the Court is directed to close the case.

**SO ORDERED**.

_/s/ Sandra J. Feuerstein_

Sandra J. Feuerstein
United States District Judge

Dated: Central Islip, New York
       May 14, 2020